IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST Richard M. FORESTER and James G. Forester, Attorneys at Law.

Supreme Court

*No. 92–1577–D. Submitted on briefs November 10, 1994.—Decided January 24, 1995.*

(Also reported in 530 N.W.2d 375.)

For Richard M. Forester & James G. Forester there the cause was submitted on the combined briefs of *Laurence C. Hammond, Jr., Jeffrey O. Davis* and

*Quarles & Brady,* Milwaukee and *Daniel W. Hilde-brand* and *Ross & Stevens, S.C.,* Madison.

For the Board of Attorneys Professional Responsibility the cause was submitted on the brief of *L. Wm. Staudenmaier* and *Cook & Franke, S.C.,* Milwaukee.

PER CURIAM. *Attorney disciplinary proceeding; attorneys' licenses revoked.*

The respondent attorneys, Richard M. Forester and James G. Forester, appealed from the referee's findings of fact and conclusions of law that they engaged in professional misconduct in their representations of and dealings with two related corporations and several trusts and from the referee's recommendation that their licenses to practice law in Wisconsin be revoked as discipline for that misconduct. The referee concluded that the appellants engaged in the following misconduct: charging and collecting excessive fees for legal services and so-called "special management services" to client corporations, charging and collecting excessive fees for administrative services to four trusts, undertaking and continuing legal representation in the presence of conflicting interests without making the requisite disclosure of those conflicts, entering into prohibited business transactions with a client and engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. We determine that the referee properly concluded that Attorneys Richard Forester and James Forester engaged in professional misconduct in those respects and that the recommended license revocations constitute appropriate discipline for it.

In respect to the separate claim of the Board of Attorneys professional Responsibility (Board) against

564

James Forester alleging that he charged and collected clearly excessive legal fees from a client in 1987 and 1988 in several legal matters, the referee concluded that the fees charged to and paid by the client were not unreasonable or clearly excessive and, accordingly, recommended that the claim be dismissed. The Board did not appeal from that conclusion and recommendation. We determine that the referee's conclusion as to that claim is proper and we dismiss that claim.

Richard Forester was admitted to practice law in Wisconsin in 1946 and practices in Brookfield. James Forester, son of Richard Forester, was admitted to practice law in 1959 and practices at the same location as his father under the name "Forester and Forester" but the two do not practice in or hold themselves out as a partnership. Neither of them has been the subject of a prior disciplinary proceeding.

On the basis of testimony and documentary evidence presented at a disciplinary hearing, the referee, Attorney Charles S. Van Sickle, made findings of fact concerning Richard and James Forester's representation of and dealings with a family-owned corporation, a company formed to hold that company's stock and several trusts for the family members, whose principal asset was stock of the holding company. The attorneys' conduct considered in this proceeding occurred from 1969, when Richard Forester was named legal counsel and made a corporate director of Western States Envelope Company (WSE), to 1989, when Richard Forester sold his WSE stock to the corporation after he and James Forester had resigned as officers, directors and attorneys for WSE and its holding company and as trustees of four trusts as part of the settlement of litigation concerning their actions as trustees.

Prior to his admission to the bar, Richard Forester had been an independent insurance agent and sold insurance to WSE, a company owned and run principally by George B. Moss, a second cousin of Richard Forester. Following bar admission, Richard Forester continued in the insurance business and also provided legal services for Mr. Moss and WSE. In 1969, he was named WSE's legal counsel, was made a corporate director and purchased 2000 shares of WSE stock.

Because WSE was a closely held corporation whose stock was not publicly traded, Richard Forester drafted stock repurchase agreements in 1969 requiring WSE's employee-shareholders who were not Moss family members to sell to the company and WSE to buy at a "formula price" WSE stock held at death. That price was periodically determined on the basis of WSE's prior earnings and ranged from 10 to 30 percent below the book value of the stock, which itself was well below the company's market value. The repurchase agreements also provided for mandatory sale of WSE stock to the company at that price upon termination of certain employee-shareholders' employment.

When he drafted a repurchase agreement in respect to his own 2000 shares, Richard Forester included the provision for sale at the formula price upon death but not the provision for sale upon termination of his employment with WSE. In 1983, when he revised the employee repurchase agreements to include a mandatory repurchase at the formula price for all employees upon termination of employment, he did not revise his own repurchase agreement to include that provision.

After he no longer was involved with WSE, the company sought to repurchase Richard Forester's stock at the current formula price as a requisite to converting

its corporate status for tax purposes. Richard Forester had refused to consent to WSE's conversion and he rejected that offer, requiring that WSE commence a legal proceeding to obtain his stock. That litigation was settled by WSE's purchase of that stock for a price approximately $440,000 greater than the price it would have paid if Richard Forester's stock repurchase agreement had included the mandatory repurchase upon termination provision he included in the other stock repurchase agreements he prepared for WSE.

The referee found that Richard Forester had the obligation to include the mandatory repurchase upon termination provision in his own agreement by virtue of the fact that for many years he had been closely involved in WSE's business as general counsel and in a policy-making position and that he considered himself having a status closely akin to that of an employee, as evidenced by the fact that he had prepared and entered into a deferred compensation agreement with WSE that included a non-competition clause. The referee also found that Richard Forester was obliged to advise the WSE officers, if not its board of directors, that his repurchase agreement did not contain the termination repurchase provision and obtain their consent to its omission. The referee concluded that Richard Forester's conduct in this regard violated former SCR 20.27,[1] prohibiting a lawyer from entering into a business transaction with a client under certain

[1] Former SCR 20.27 provided, in part:

**Limiting business relations with a client.**

(1) A lawyer may not enter into a business transaction with a client if they have differing interests in that transaction and if the client expects the lawyer to exercise his or her professional judgment in the transaction for the protection of the client, unless the client has consented after full disclosure.

circumstances without obtaining the client's consent after making full disclosure to the client.

In 1972, Mr. Moss began to withdraw from active involvement in the operation of WSE and created a new three-person executive committee consisting of his son, George French Moss, Richard Forester and the company's president. In creating that committee, Mr. Moss made it clear that Richard Forester was to act in a consulting capacity with the other members of the committee, particularly in respect to legal work, business affairs and finance, but was not to have any responsibility in the operation of the business, except in respect to policy matters. At that time, WSE placed Richard Forester on a $2,500 per month retainer as legal counsel and Richard Forester made it clear to Mr. Moss that he expected to handle all of the company's group insurance, pension plans and corporate insurance, for which he would receive commissions in addition to his retainer. Richard Forester continued to direct WSE's insurance matters throughout his relationship with the company and, as a practical matter, anyone interested in selling insurance to WSE first had to go through him.

The referee found an intimidation factor involved in Richard Forester's handling of all WSE's insurance needs. He found further that while Mr. Moss effectively had waived any conflict Richard Forester might have had in providing legal services to WSE as well as pro-

Because the majority of the conduct considered in this proceeding occurred prior to 1988, the applicable disciplinary rules are those set forth in the former Code of Attorneys Professional Responsibility and references to the provisions of that code are used. For conduct occurring after 1987, the applicable rules are the current Rules of Professional Conduct for Attorneys, SCR chapter 20.

viding or controlling sales of life and health insurance to the company, that waiver did not continue after Mr. Moss' death in 1982 and did not apply to the conflict that arose when Richard Forester became trustee of the family trust that came into existence upon Mr. Moss' death. That trust received the income from WSE earnings, earnings that were directly affected by Richard Forester's commissions from his sale of insurance to WSE. The referee concluded that Richard Forester violated SCR 20.27(1) by entering into a business transaction with his client in which they had differing interests and the client expected the lawyer to exercise professional judgment in the transaction to protect the client without the client's consent after full disclosure.

In addition to his services to WSE, Richard Forester provided legal services to George B. Moss personally. In 1970, as part of an estate plan, he drafted a revocable living trust for Mr. Moss, designating Mr. Moss, his son and Richard Forester and James Forester trustees. When he created that trust, Mr. Moss expressed to the trustees his intent that his son retain a responsible position in WSE as long as he cared to, that WSE remain an independent company and, after his son's death, retirement or withdrawal from the company, that it be sold to its key employees. In 1981, Richard Forester, at Mr. Moss' direction, created three irrevocable trusts, one for each of Mr. Moss' three grandchildren, naming French Moss and Richard and James Forester trustees of each of those trusts.

Also in late 1981, Mr. Moss had Richard and James Forester incorporate a holding company, Moss Company, Inc. (MCI), to hold controlling interest of WSE, with Mr. Moss, his son and Richard and James Forester its initial officers and directors. Pursuant to Mr. Moss' estate plan, WSE preferred stock was dis-

tributed to MCI and, in turn, MCI's preferred stock was distributed to Mr. Moss' revocable trust and its common stock to the three grandchildren's trusts, such that income from WSE stock went to Mr. Moss and the increase in the equity of WSE stock went to the benefit of the grandchildren.

Upon Mr. Moss' death in 1982, two trusts resulted, one for his widow and the other for his family, and French Moss, Richard Forester and James Forester were the trustees of those trusts. The widow's trust terminated on her death in 1986. Richard Forester and French Moss were co-executors of the estates of Mr. Moss and his wife and James Forester served as attorney for those estates.

In 1986, WSE experienced difficulties with its management personnel. An executive vice president whose usurpation of authority had caused dissension with other members of management was discharged and Richard and James Forester, believing there was a crisis at WSE because it lacked strong leadership, developed an operational plan placing WSE management in two bodies, an executive committee consisting of themselves and French Moss, with Richard Forester as chairman, and an operations committee consisting of the executive committee and two other members of management. That plan ostensibly vested day-to-day operational control of WSE in the operations committee but the referee found that, in effect, it placed Richard and James Forester in control of the company because they controlled the executive committee, which in turn controlled the operations committee. The referee also found that Richard and James Forester had no particular experience or expertise in the management of a company like WSE and that their assumption of high level management roles was not by

invitation and was neither submitted to nor approved by WSE's board.

Commencing June 30, 1986, Richard Forester and James Forester billed WSE for "special management services," in addition to Richard Forester's monthly legal retainer of $2,500 and fees for other legal services. The special management services bills were submitted on "Forester and Forester" letterhead and combined the services of both attorneys into a single figure, with no breakdown of the services provided by each. Over a seven-month period, their charges for those services totaled $231,000.

In November, 1986, Richard and James Forester undertook to have themselves placed on the WSE employee payroll. At a meeting of the operations committee, without prior notice or discussion, they presented a proposal reducing French Moss' authority as president, continuing Richard Forester as chairman of the executive committee and naming James Forester vice president and general counsel. Pursuant to the proposal, each member of the operations committee, including Richard and James Forester, would receive a salary of $78,000 per year, plus bonus, and Richard and James Forester would participate in WSE's profit sharing, pension and health insurance programs and receive all other employee benefits. The plan also provided that when the special management services fees of Richard and James Forester exceeded their monthly salaries, they would bill WSE for the excess, as well as for their legal fees. The referee found that the other members of the operations committee acquiesced to the proposal as a result of being intimidated by the fact that Richard and James Forester, as two of the three trustees of the several trusts holding controlling interest in WSE, effectively controlled the company.

571

The referee concluded that the fees Richard Forester and James Forester charged WSE for legal services and "special management services" and the fees they charged the four trusts for legal and administrative services were excessive, in violation of SCR 20.12.[2] The referee found the following amounts of fees billed to and collected from WSE by Richard and James Forester for services from 1982 through 1986:

| 1982 | — | $114,000 |
|------|---|----------|
| 1983 | — | 130,000 |
| 1984 | — | 88,000 |
| 1985 | — | 116,000 |
| 1986 | — | 424,000 |

[2] Former SCR 20.12 provided, in part:

**Fees for legal services.** (1) A lawyer may not enter into an agreement for, charge or collect an illegal or clearly excessive fee.

(2) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(a) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

(b) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(c) The fee customarily charged in the locality for similar legal services.

(d) The amount involved and the results obtained.

(e) The time limitations imposed by the client or by the circumstances.

(f) The nature and length of the professional relationship with the client.

(g) The experience, reputation and ability of the lawyer or lawyers performing the services.

(h) Whether the fee is fixed or contingent.

In addition, in 1987 WSE paid Richard and James Forester $159,000 in legal fees and $136,000 in salaries and bonuses, plus the value of fringe benefits they received as employees. The total payments from WSE to Richard and James Forester for the period totaled $1,167,000. In addition, for 1985, 1986 and 1987, Richard and James Forester charged the family trust and the widow's trust $65,000, $39,000 and $28,000, respectively, for legal and administrative services.

Richard and James Forester billed all of their services to WSE and the trusts at their hourly rates for legal services, $200 and $175, respectively. James Forester regularly submitted his bill for services to his father, who then billed WSE for the services of both of them as a single figure, setting forth no detail as to the nature or type of services performed or the time spent on them. The attorneys testified that the detail and breakdown of their services had been available and was used in preparing their bills but once the bills were paid, that information was eliminated from their computer and was no longer available.

The referee found that, following the death of Mr. Moss, WSE management had sought additional information and had questioned Richard and James Forester about their bills and that the matter was brought up at a WSE board meeting in late 1986, at which Richard Forester declared that the bills should be paid and the matter of their itemization should not be brought up. The referee also found that WSE management did not pursue further the matter of either the size of the bills or the lack of detailed information on them because it was intimidated by the fact that Richard and James Forester were two of the three trustees of the trusts having controlling interest in the holding company and believed they controlled WSE, a belief

573

Richard and James Forester fostered. The referee further found that WSE management repeatedly sought additional information and explanation concerning the legal bills and that those requests were rejected and that Richard Forester did not comply with the repeated requests of French Moss for a written explanation of the services justifying the bills.

In concluding that their fees were excessive, the referee took into account that whenever WSE required specialized assistance, such as in regard to bond, tax, patent or labor matters, Richard and James Forester referred that work to outside counsel. The referee found their hourly rates for the special management services excessive in light of the fact that Richard and James Forester had no expertise, training or experience in the field of corporate management. In respect to the trusts, the referee found their services neither involved nor complicated, having consisted primarily of depositing dividends and buying treasury instruments; an accountant was retained to prepare the trusts' tax returns. Yet, Richard and James Forester charged the trusts $132,000 for the period March, 1984 to June, 1987. The referee found, on the basis of expert testimony, that $1,000 per year was a reasonable fee customarily charged in the locality at that time for services of the kind Richard and James Forester provided to the trusts and concluded that their fees, which averaged approximately $40,000 per year, were excessive, in violation of SCR 20.12.

At the end of 1986, Richard and James Forester undertook to change the corporate tax status of WSE to take advantage of a provision of the tax law that was particularly beneficial to the company. To do so, it was necessary that the change be accomplished by the end of the year and, under the tax law rules, the family

trust would first have to divest itself of MCI stock. The plan was to merge MCI with WSE and Richard and James Forester made several proposals for the disposition of MCI stock and its exchange for WSE stock, all of which were based on valuing the WSE stock at its formula price. One of the proposals called for the ultimate sale of WSE stock to French Moss and Richard and James Forester as co-trustees of a voting trust. Pursuant to another proposal, drafted by James Forester, the family trust's stock would be divided into three equal portions and one of them sold to Richard Forester, one to James Forester and the third to French Moss. That proposal would have resulted in Richard and James Forester together owning controlling interest of WSE.

The referee found that in their proposals to accomplish the conversion of WSE, Richard and James Forester represented to the trust beneficiaries that the formula price was a fair price for WSE stock. The sales and purchases of WSE stock they proposed, including the proposal for their own purchase of that stock, and proposed redemption agreements with the grandchildren trusts were to be at the formula price. The referee found that, as there had been no agreement for the redemption of stock held by the grandchildren trusts, Richard and James Forester, as two of the trustees, could properly commit those trusts to redemption agreements at the formula price only if that price were in the best interest of the trusts. The referee found, however, that Richard Forester knew or at least believed that the formula price represented less than fair value of WSE stock, as evidenced by his testimony in litigation concerning the sale of his own WSE stock in which he gave reasons why the formula price should

not be used to determine the amount he should receive for that stock.

When the proposal for the sale of two-thirds of the WSE stock from the family trust to Richard and James Forester became known, an attorney was retained to represent the interests of the beneficiaries of the family trust and the grandchildren's trusts. That attorney met with Richard and James Forester and objected on his clients' behalf to any sale of WSE stock held in the several trusts to persons other than the trust beneficiaries and also stated that the beneficiaries wanted to purchase that stock. Soon thereafter, the trust beneficiaries authorized the trustees to sell the WSE stock the family trust would receive as a result of the proposed merger with the holding company to French Moss and his sister at the formula price.

Shortly before the end of the year, when the proposed WSE conversion failed because the requisite consent of all WSE shareholders could not be obtained, as several management employee-shareholders refused to agree, it was no longer necessary to sell the family trust's stock and merge WSE with the holding company. Nevertheless, because Richard and James Forester had suggested at the time of the proposed merger and sale of the family trust's stock that the trust should diversify its assets, the trust beneficiaries continued to be concerned that the trust's stock was going to be sold. For that reason, on December 31, 1986 their attorney reaffirmed to Richard and James Forester their desire to purchase the MCI stock from the family trust. On the same day, two members of WSE's management proposed to purchase the MCI stock from the family trust and when the beneficiaries' attorney learned of that proposal, he repeated to Richard and James Forester his clients' desire to purchase the stock

and that no offer from any other persons would be acceptable to the beneficiaries. Richard and James Forester did not respond to any of the beneficiaries' offers.

On January 8, 1987, the attorney for the beneficiaries wrote to Richard Forester requesting that either he or James Forester resign as trustee of the family trust and the grandchildren's trusts so that the beneficiaries could appoint a replacement trustee. The beneficiaries' attorney set forth in that letter what he considered many conflicts of interest Richard and James Forester had and asked them for copies of inventories and annual accounts of the four trusts, which the trustees never had provided to the beneficiaries.

On January 12, 1987, the WSE management group made an offer to purchase the family trust's MCI stock at a price $1.4 million higher than the formula price offered by the beneficiaries. Richard and James Forester, who had retained a law firm to represent them as trustees in late December, 1986 when they received the beneficiaries' offer to purchase the MCI stock, filed a petition with the probate court on January 15, 1987 seeking an order directing them to accept the management group's offer, stating their belief that acceptance of that offer would be in the best interest of the trust. The referee found that when that petition was filed, Richard Forester knew that the actual value of WSE was significantly greater than its book value but neither he nor James Forester had commissioned an appraisal of WSE nor did they suggest to the court that an appraisal be required. The referee noted that in 1989, when Richard Forester sought to establish the value of his own WSE stock, he commissioned an appraisal.

The referee found that Richard and James Forester, as experienced attorneys, were not unaware of

their actual or potential conflicts of interest as trustees and attorneys for the trusts and as officers, directors, legal counsel and employees of WSE. They had sought and obtained the advice of their attorney, who set forth in a letter to them what he considered serious potential problems, specifically including ethical problems, they faced in the court proceeding. Those problems included that the court would be unlikely to order a sale of trust assets without an appraisal, the management group's offer was substantially below WSE stock's book value, the court would be concerned with Richard and James Forester's receipt of salaries, bonuses and fringe benefits from the company, the merger proposal by which Richard and James Forester would become owners of two-thirds of controlling interest in WSE and their direct involvement in WSE management likely would persuade the court that they had been furthering an inappropriate personal desire to control the company and derive benefits from it. The referee found that, notwithstanding that explicit warning from their attorney, Richard and James Forester made no attempt to eliminate any conflict of interest but proceeded with the litigation. They did, however, file an amended petition asking the court to authorize them to solicit offers to purchase the family trust's stock and submit for court approval what they considered the best offer.

The beneficiaries filed an objection to the petition and a cross-petition seeking the removal of Richard and James Forester as trustees, an order requiring them to provide full accountings of their management of the trusts and the prohibition of the sale of any trust assets without court approval. James Forester filed a response and counterclaim to the cross-petition alleging that the cross-petition was frivolous and an abuse of process and asking for $2 million compensatory dam-

ages and $2 million in punitive damages from the beneficiaries.

The litigation ultimately was settled by, among other things, the resignation of Richard and James Forester as trustees of the four trusts and as directors, officers, consultants to and attorneys for WSE and MCI, a mutual release by them and the beneficiaries from all claims, payment to them for unpaid legal services to WSE and payment of their attorney fees. In his findings of fact, the referee referred to the testimony of the beneficiaries' attorney that they settled the litigation because of their concern that Richard and James Forester, as trustees, would remain in control of the holding company and WSE during the time it would take to conclude the litigation.

The referee concluded that in their dealings with WSE, MCI and the trusts and their beneficiaries, Richard and James Forester engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20.04(4).[3] The referee specified that misconduct as follows:

(1) developing and implementing a plan that placed them in positions of control of WSE as two of three members of its executive committee without consideration by or approval of the WSE board;

(2) charging WSE a total of $231,000 for "special management services" without authorization from management or the WSE board that were unsolicited by management or the board and the charges for which

---

[3] Former SCR 20.04(4) provided:

**Misconduct.** A lawyer shall not:

. . .

(4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

579

were unsupported by any documentation as to services provided, time spent or results obtained;

(3) manipulating through intimidation or otherwise to take advantage of WSE management in order to put themselves on the company payroll as employees, at very substantial salaries and with very substantial bonuses and full fringe benefits;

(4) attempting to implement a plan by which they would acquire ownership of a controlling interest in WSE at a price several million dollars lower than what they knew that interest was worth;

(5) proposing a plan under which they would ultimately acquire ownership of the assets of a trust of which they were trustees at a price they knew was substantially lower than the actual value of the assets;

(6) representing to the trust beneficiaries that the formula price for WSE stock was fair value for the assets of the trusts;

(7) seeking a court order authorizing them to sell assets out of trust at a price they knew was significantly lower than the actual value of those assets;

(8) pursuing litigation in respect to the trust and, in the case of Richard Forester, litigation to establish the value of his WSE stock to the point where they were, in effect, rewarded for their prior misconduct and breaches of duty in the representation of their multiple clients.

Finally, the referee concluded that Richard and James Forester violated the conflict of interest rules, SCR 20.24[4] and 20.28.[5] The referee specified that their

---

[4] Former SCR 20.24 provided, in part:

**Refusing employment when the interests of the lawyer may impair his or her independent professional judgment.** (1) Except with the consent of the client after full disclosure, a lawyer may not accept employment if the exercise of

violations of the conflict of interest rules resulted from their failure to make full disclosure of their conflicting interests in their many dealings with WSE, MCI and the four trusts. That conclusion was explicitly based on the fact that there had been a long-term relationship between Richard and James Forester and the members of the Moss family and the extent to which those family members had come to trust and rely on them. The referee had found that Richard and James Forester never considered any of their various roles in these matters to be in conflict but considered that whatever was in the best interest of one of the entities they represented was in the best interests of the others. The referee also found that, while Mr. Moss had trusted Richard and James Forester to see that the best interests of his family and his company were protected, at

his or her professional judgment on behalf of the client will be or reasonably may be affected by his or her own financial, business, property or personal interests.

[5] Former SCR 20.28 provided, in part:

**Refusing to accept or continue employment if the interests of another client may impair the independent professional judgment of the lawyer.** (1) A lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under sub. (3).

(2) A lawyer may not continue multiple employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, except to the extent permitted under sub. (3).

(3) In the situations covered by subs. (1) and (2), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

no time did he express a desire to have them personally take over control of WSE. To the contrary, Mr. Moss very clearly expressed his desire that they, and specifically Richard Forester, not become directly involved in the management of the company.

As discipline for their professional misconduct in these matters, the referee recommended that the court revoke the licenses of Richard and James Forester to practice law in Wisconsin. In making that recommendation, the referee acknowledged that, at least initially, the lawyers took control of the active management of WSE "out of a sincere belief that they had the responsibility to do so" in response to what they perceived to be a crisis in WSE management, a perception the referee believed was unjustified, but at least beginning in 1986, their desire for personal benefit "took over or at least got in the way." Emphasizing that their conduct deteriorated to the point that James Forester brought a monetary claim against the beneficiaries of the trusts of which he and his father were trustees, the referee deemed the lawyers' professional misconduct egregious:

> "It is clear that the Foresters became hopelessly entangled in a mesh of conflicting personal interests and conflicting duties and responsibilities in their several capacities, to the trusts, to the beneficiaries, and to the corporations.
>
> They refused to recognize the impossible situation in which they had placed themselves and refused to budge until they were able to force a settlement very favorable to themselves.
>
> The Foresters appeared to be completely insensitive to their conflicts and made no concession whatsoever that they had in any manner acted improperly."

In their appeal from the referee's report, in addition to arguing that the referee's conclusions that they violated the rules of attorney ethical conduct were improper, Richard and James Forester contended that the referee has erred in several respects. First, the referee rejected their claim that the Board should be estopped from challenging the amount of their fees charged to WSE and the trusts on the ground of laches, as the attorney for the trust beneficiaries did not file a grievance with the Board until three months after the trust litigation was settled in June, 1987 and the Board did not inform them of that grievance until almost one year thereafter. Richard and James Forester contended that they were justified in disposing of their records following settlement of the trust litigation and that their failure to reconstruct their time records to support the amount of fees they charged was justifiable.

That argument has no merit, as it ignores the fact that, as they testified, Richard and James Forester routinely deleted detail of their billings to WSE and the trusts once their bills were paid. Moreover, they were put on notice during the trust litigation that their fees were being questioned and they were being asked for accountings of their trust management.

Also without merit is the appellants' contention that the referee erred in rejecting their claim that this disciplinary proceeding is barred by the doctrine of *res judicata* by virtue of the settlement of the trust litigation and its dismissal on the merits. Richard and James Forester contended that the claims of professional misconduct asserted in this disciplinary proceeding were the same as those made in the trust litigation by the beneficiaries in their cross-petition. That argument rests on the unwarranted assertion

that the probate court had authority to resolve in the context of the trust litigation allegations of professional misconduct. Likewise unwarranted is the appellants' assertion that the court's dismissal of the litigation with prejudice on the basis of the parties' settlement "presumes" that the court addressed the misconduct allegations.

The appellants also argued that the referee improperly admitted into evidence the letter their attorney had written in response to their request for advice concerning their petitioning the court for authorization to accept the WSE management offer to purchase MCI stock from the family trust. They contended that the letter was irrelevant and its admission violated James Forester's attorney-client privilege. That letter was produced in the course of the Board's discovery in this proceeding by the law firm Richard and James Forester had retained to represent them as trustees in connection with the trust litigation but, at the time the letter was produced, represented only Richard Forester. The appellants contended that the referee erroneously ruled that James Forester had waived the privilege and asserted that the admission of the letter was prejudicial error entitling James Forester to a new hearing.

The appellants have failed to establish that the admission of the letter from their attorney was improper. They erroneously asserted that the referee's conclusions that they engaged in misconduct by seeking court authorization to sell WSE stock out of the family trust at a price below actual value and by pursuing litigation against the trust beneficiaries were based on their attorney's statements in that letter concerning potential ethical problems that might arise in that litigation. To the contrary, the referee relied on that letter

for the limited purpose of establishing that Richard and James Forester continued to pursue litigation against the trust beneficiaries after having been alerted by their own attorney to questions of the ethical propriety of that course of action. In that respect, the referee also relied on the fact that Richard and James Forester had been put on notice of conflict of interest questions at an earlier date by letter from the beneficiaries' attorney asking them to resign as trustees.

The appellants then argued that the referee erred by rejecting their request to sequester at the disciplinary hearing the officers and directors of WSE and their attorneys who were to be called as witnesses. The appellants' contention that the failure to sequester witnesses created a presumption of prejudice has no persuasive support and the appellants have not shown that the referee's determination that those persons, who were among those filing the grievance with the Board, were necessary to the proper presentation of this disciplinary proceeding was erroneous.

The appellants also contended that the referee's conclusion that they violated the ethical rules prohibiting lawyers from representing clients where the interests of the clients conflict with the interests of other clients or of the lawyers themselves without consent after full disclosure was improper because the referee did not specify what they had failed to disclose to their clients and because the trust beneficiaries were not their "clients." The appellants took the position that the full disclosure required by the conflict of interest rules was satisfied by the fact that WSE management was aware of Richard Forester's interests in selling insurance to the company and drafting his stock repurchase agreement and was aware of the ser-

vices Richard and James Forester provided as "management consultants."

We reject those arguments as having no merit. Full disclosure contemplated by the conflict of interest provisions of the lawyer ethics code requires far more than merely the client's awareness of facts that may create or suggest a conflict of interest. The disclosure must be sufficient to inform the client of possible adverse effects the conflicting interests of the lawyer or of others might have on the lawyer's representation of the client.

Further, the appellants wrongly asserted that the conflict of interest rules do not apply to their dealings with the trust beneficiaries because there was no direct attorney-client relationship with them and, consequently, they owed them no duty. The appellants' argument that their duty as trustees was principally to Mr. Moss, the settlor of the trusts, ignores their duty of loyalty to the trust beneficiaries and their fiduciary responsibility to administer the trusts in their interest. Moreover, even when considered only in terms of their duty to Mr. Moss, the appellants' actions were contrary to his express directions to preserve the primary asset of Mr. Moss' estate, WSE, to ensure that his son would continue to be involved in the company's management as long as he wished and that WSE remain a family corporation until his son was able or desired to do so. Also contrary to Mr. Moss' express intent was the appellants' assumption of the management of WSE.

The appellants' argument that they did not engage in dishonest conduct in their dealings with WSE because WSE management knew and, in some instances, approved what they were doing also fails. Their contention that everything they did was "open and above board" is untenable, particularly in light of

their positions of control over WSE directly and through the trusts and their intimidation of the company's management.

On the issue of discipline, the appellants took the position that if the court determines that they engaged in professional misconduct, appropriate discipline would be a public reprimand. That position is based on their assertion that they "cared too much—felt too strongly the obligation to carry out their client's wishes." They also noted that the referee considered Richard Forester as more culpable than James Forester and that, considering James Forester's conduct separately, revocation of his license would constitute excessive discipline.

Regardless of the relative degree to which the appellants engaged in professional misconduct, the misconduct of each of them is egregious and warrants the imposition of the most severe discipline—license revocation. Richard Forester and James Forester, together and each in his own way, placed their personal financial interests over the interests of the several entities they represented and to which they owed a duty of loyalty, as well as a fiduciary duty. They went so far as to seek to obtain by litigation results directly adverse to the interests of the beneficiaries of the trusts of which they were trustees and, in James Forester's case, sought monetary damages from those beneficiaries. In so doing, they chose to ignore the beneficiaries' offers to purchase the stock of the family corporation held by the trusts and they retained counsel to assist them in preventing the beneficiaries from realizing that objective.

Richard Forester and James Forester, acting at times independently and at times in concert, used their position of trust and respect that first Mr. Moss and

then his descendants had placed in them to further their own pecuniary interests. They used their power and influence over their clients—WSE, MCI and the trusts—to take control of the operation of WSE and charge excessive fees in the various roles they assumed. When it appeared that the trust beneficiaries would no longer permit them to do so, they attempted to sell the company out of trust and out of the Moss family.

We adopt the referee's findings of fact and conclusions of law and determine that the discipline recommended by the referee is the appropriate response to the seriousness of the professional misconduct of Richard and James Forester established in this proceeding.

We next address the objection filed by each of the appellants to the Board's statement of costs incurred in this proceeding. The first ground set forth in those objections concerned the allocation of costs between the two claims of the Board's complaint, the second of which the court has determined to dismiss. The appellants contended that the Board's allocation of costs between the two claims was purely speculative, as it was made after the costs had been incurred and there were no detailed records provided showing the time of Board counsel and the referee spent on each of the two claims. Their second ground for objection was the absence of an allocation of fees of board counsel or the referee for services in the proceeding as they related to Richard Forester and James Forester separately. The appellants also objected to the costs for services of the reserve judge initially assigned as referee, who declined the appointment after reviewing the record and learning that it would require two weeks of hearing, an expert the Board had consulted but who did not

testify, and an expert who did testify but did not disclose in his billing to the Board the number of hours he spent in the matter. Finally, James Forester objected on the ground that two of the attorney experts testifying for the Board billed their services at $150 per hour, which he contended impermissibly exceeded the rate specified in former SCR 81.02(1) for compensation of attorneys "appointed by any court to provide legal services for that court . . . and for boards, commissions and committees appointed by the supreme court."

In response to those objections, the Board amended its statement of costs, deleting the reserve judge's charge and the charge of the non-testifying expert witness. Thereafter, the appellants reasserted their remaining objections.

We reject the appellants' objection to the Board's revised statement of costs. The lengthy documentation supplied by the Board supports its position that the allocation of counsel and referee services between the two claims of its complaint constitutes a sufficient basis for an accurate, not speculative, assessment of costs. Further, as the Board had alleged identical misconduct against each of the appellants and the referee found each of them to have engaged in that misconduct, albeit both of them not acting in all of the matters considered, the absence of an allocation of costs as between Richard and James Forester so that each might be assessed only those costs incurred in relation to him is unnecessary. It is appropriate that one-half of the total costs be assessed against each of them.

The appellants also objected to the Board's supplemental statement of costs incurred in the appeal. They objected to seven hours attributed to Board counsel's time spent prior to the filing of the notice of appeal in reviewing billings and conferring with the Board in

order to apportion costs between the two claims. In its response, the Board agreed to reduce the supplemental statement of costs by the amount attributable to that activity. We reject as without merit the appellants' remaining objections to the costs of copying and costs attributed to the services of an associate attorney in the office of Board's counsel.

IT IS ORDERED that the second claim of the complaint in this proceeding is dismissed without costs.

IT IS FURTHER ORDERED that the license of Richard M. Forester and the license of James G. Forester to practice law in Wisconsin are revoked, effective March 1, 1995.

IT IS FURTHER ORDERED that within 60 days of the date of this order, Richard M. Forester and James G. Forester each shall pay to the Board of Attorneys Professional Responsibility one-half of the costs of this disciplinary proceeding adjusted as specified in this opinion.

IT IS FURTHER ORDERED that Richard M. Forester and James G. Forester comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been revoked.